

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00431-CR

DERRICK CASH SMITH                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY
TRIAL COURT NO. CR-2014-06227-B

----------

## MEMORANDUM OPINION[1]

----------

Upon his plea of not guilty, a jury convicted Appellant Derrick Cash Smith of driving while intoxicated (DWI), and upon his plea of true to a prior misdemeanor DWI conviction, the trial court found him guilty of enhanced misdemeanor DWI and sentenced him to pay a $500 fine and to serve 350 days' confinement, suspending imposition of the confinement portion of the sentence

---

[1]*See* Tex. R. App. P. 47.4.

and placing Appellant on community supervision for eighteen months. Appellant agreed to serve five days in jail as a condition of community supervision. In three issues, Appellant challenges the voluntariness of his plea and contends that his trial counsel was ineffective. Because we hold that the trial court did not reversibly err by failing to admonish Appellant and that Appellant did not satisfy his burden to prove ineffective assistance of trial counsel, we affirm the trial court's judgment.

**Statement of Facts**

The information charged that on or about February 8, 2014, Appellant "operate[d] a motor vehicle in a public place in Denton County, Texas, while intoxicated." The information did not allege a definition of intoxication or specific intoxicants. The information included an allegation that Appellant had a previous 1990 misdemeanor DWI conviction. The parties waived the taking of voir dire by the court reporter. Appellant waived arraignment. A Denton County Community Supervision and Corrections Department document bearing the date April 7, 2015, and filed with the county clerk indicates that Appellant is a citizen of the United States. Blank space follows the term "Alien Reg#" on the document.

The jury heard the following evidence in the August 27, 2015 trial. On February 8, 2014, at around 9:15 p.m., Officer Mark Pool of the Carrollton Police Department noticed a black Dodge truck parked in the parking lot of a RaceTrac gas station. The driver's head was down, and he "appeared to be messing around with something in his hands, around his arms." Officer Pool followed the

2

truck into the roadway. The driver did not stop at the stop line for a red light at an intersection. Then the driver turned right into the farthest lane from him at that red light instead of turning into the nearest available lane. Officer Pool stopped the vehicle for traffic violations; Appellant was the driver. Officer Pool testified that he did not smell alcohol and that Appellant seemed fine, was calm, and was not acting anxious. Appellant consented to a search of the truck by Officer Pool; nothing incriminating was found.

Meanwhile, another officer, Officer William Carmichael, had arrived. He testified that when Officer Pool asked Appellant to exit the vehicle so that it could be searched, Appellant walked by him. As Appellant walked by Officer Carmichael, Officer Carmichael noted that Appellant "was kind of emitting an odor of an alcoholic beverage" and exhibiting "sort of . . . gait ataxia," "kind of a plod walk." An ataxic gait is "[a]n unsteady, staggering gait" in which "walking is uncoordinated."[2] Officer Carmichael clarified that Smith had walked with "a heavy step every step that [was] consistent from side to side" and on both feet. Officer Carmichael testified that when asked about problems with his ankles, knees, or hips, Appellant said that he had sprained his ankle the previous day but conceded that he was not having any issues walking. Officer Carmichael then conducted standardized field sobriety tests. He testified that Appellant failed the walk-and-turn test and the one-leg stand. Officer Carmichael testified that he

_____

[2]"Ataxia," http://www.hopkinsmedicine.org/neurology_neurosurgery/centers _clinics/movement_disorders/ataxia/conditions/ (last visited 6/22/16).

3

observed only two out of six clues on the horizontal gaze nystagmus (HGN) test, a score which does not indicate intoxication, but he abandoned the test because he believed that Appellant was not being cooperative and was deliberately not focusing on the stimulus. On cross-examination, Officer Carmichael conceded that no portion of the HGN test appears on the video recording of the arrest scene and that while he conducted the HGN test behind the truck, he moved Appellant "right in front of the camera" for the other two standardized tests.

Appellant had told Officer Carmichael that he had taken Xanax and Zofran earlier that morning but initially denied having drunk any alcohol. Officer Carmichael therefore also administered two nonstandard tests, the Romberg test and an eye test for lack of convergence. To administer the Romberg test, an officer has the subject stand with his feet together and his arms at his sides. The officer then directs the subject to raise his head, close his eyes, and estimate thirty seconds. The officer evaluates the estimate but also looks for swaying and fluttering eyelids as signs that the person is under the influence of a depressant. Officer Carmichael testified that Appellant's estimate was "pretty close" and that Appellant did not sway at all but that Appellant's eyelids "fluttered" pronouncedly, indicating that he was under the influence of a depressant. According to Officer Carmichael, Appellant performed normally on the test for lack of convergence; that is, Appellant's eyes converged, or crossed, as Officer Carmichael moved the stimulus closer to the bridge of Appellant's nose.

4

Medical records admitted at trial showed that instead of having a sprained ankle, Appellant had fractured the fifth metatarsal on his right foot. Officer Carmichael had testified that he would have expected a person with a broken foot to "limp and favor a leg." He also admitted on cross-examination, however, that he would not have expected someone with a broken foot to perform well on the walk-and-turn test. Officer Carmichael testified that the one-leg stand test would not be affected by a broken foot if the suspect stood on the uninjured foot.

Medical records also showed that Appellant suffered from general anxiety disorder. Officer Carmichael admitted on cross-examination that anxiety could affect a person's ability to perform the field sobriety tests in some circumstances. But he reiterated on redirect examination that Appellant had seemed fairly relaxed that night and not anxious. Officer Carmichael decided that he had probable cause to arrest Appellant for DWI and arrested him. Appellant refused a blood test, so the police took Appellant's blood pursuant to a warrant.

Officer Micah Hasper testified that he was a City of Carrollton detention officer. In that role, he also functioned as a certified blood technician. He drew Appellant's blood at 11:27 p.m. Officer Hasper remembered Appellant saying at the time of the blood draw that he was feeling pretty anxious and asking how to get his medication.

Andrew Macey, the drug section supervisor at the Texas Department of Public Safety (DPS) crime lab in Garland, testified that Appellant's blood alcohol concentration (BAC) was found to be .077. On cross-examination, Macey

admitted that the BAC had a .008 measurement of uncertainty. The following dialogue also occurred:

Q. Okay. So what can you say at the time of the stop, at 9:12?

A. Well, it depends on when the last drink was.

Q. And you don't know that?

A. Correct.

Q. So can you say with any scientific certainty that at 9:12— under that fact scenario that was given to you by [the prosecutor], that at 9:12—in that scenario, a person driving at 9:12 was greater than .08?

A. I do not know given the facts that I was given.

Q. So that's a no, you don't know?

A. Correct.

Q. So it's possible given those facts that the person that was driving at 9:12 was actually under a .08?

A. It's a possibility.

Q. And you're using the number based on .077, which you agree there is a margin of error of plus or minus .008?

A. Correct.

Q. So just to be clear, you cannot say that the person in the scenario, the hypothetical that [the prosecutor] gave you at the time of driving his vehicle was per se intoxicated?

A. I do not know.

Eduardo Padilla, a forensic scientist and the custodian of records for the Austin DPS crime lab, testified that Appellant's blood also contained .069 milligrams per liter of alprazolam, the generic name for Xanax, and less than .05 milligrams per liter of nordiazepam, a metabolite or byproduct of diazepam, the

6

generic name of Valium. Padilla further testified that alprazolam and diazepam, as well as alcohol, are central nervous system depressants. Padilla also testified that the level of alprazolam in Appellant's blood was too high for a person taking the drug for anxiety but within the normal range if a person took the drug for panic attacks. Padilla additionally testified that a warning label accompanies Xanax and instructs the patient not to take it with alcohol because the two substances can produce "an additive effect, meaning that the total effect is the sum of the two drugs working together to produce a greater effect," and can increase impairment.

On cross-examination, Padilla admitted that he did not know if Appellant had panic attacks, what he was prescribed, or the levels of those prescriptions. Padilla also admitted that he could not say that someone with a .077 alcohol concentration plus a .069 concentration of Xanax was legally intoxicated, just that the likelihood was higher, and that he could not say that the combination of alcohol and drugs impaired Appellant. Padilla further testified that the minute level of diazepam in Appellant's blood merely indicated prior usage of the drug, and Padilla admitted that because the lab "see[s] them commonly together," he "imagine[d]" that doctors prescribe Xanax and Valium together for anxiety.

Defense counsel offered Appellant's medical records, which were admitted, but called no witnesses before resting. Defense counsel stated, "No objection," to the proposed charge.

7

During deliberations, the jury asked to view the dash cam video and the medical records.

After the jury found Appellant guilty of DWI and was released, the trial court announced a recess for the parties to "talk" about a punishment agreement. After the recess, Appellant pled true to the allegation that he had previously been convicted of DWI. The trial court accepted the plea and the agreement that Appellant had apparently reached with the State, found him guilty of the enhanced misdemeanor offense of DWI, and sentenced him to 350 days' confinement in jail, suspended for eighteen months, and a $500 fine.

Having obtained new counsel after his conviction, Appellant filed a motion for new trial. The trial court initially granted the motion for new trial, but after briefing and amended briefing, the trial court ultimately denied the motion for new trial. Appellant's request for permission to appeal despite the bargain reached with the State, which apparently included a waiver of his right to appeal, was granted. The record before us does not contain a recitation of the bargain, any plea-bargain documents, or a signed waiver of appeal.

At the hearing on his motion for new trial, Appellant testified that he had wanted to testify in his own defense at trial and present his medical records, but his former defense counsel would not let him. Appellant also testified that his former defense counsel never showed him the records of his prior conviction. Appellant further testified that former defense counsel coerced him into agreeing to the sentencing bargain, stating to Appellant, "[T]his is the best deal you're

8

going to get," and, regarding the five days' confinement as a condition of community supervision,

> [I]f we approach the judge, you're probably going to get 30 days or maybe even more." And so [former defense counsel] was putting [Appellant] in a state of fear, anxiety, pressure, and [Appellant] was very afraid that if [he] did approach the judge that [he] could get that 30 days. And [former defense counsel] kind of coerced [Appellant] into going ahead and signing that document by his statements and kind of in a very demanding demeanor, voice, so to speak.

Former defense counsel was not called as a witness at the hearing on the motion for new trial, nor was an affidavit from him submitted.

**Guilty Plea Admonishments**

In his second issue, Appellant contends that the trial court erred by failing to admonish him under article 26.13 of the code of criminal procedure.[3] Article 26.13 does not apply to misdemeanors.[4] Appellant also appears to complain that his plea of true to the offense enhancement allegation is insufficient to support his conviction of the enhanced misdemeanor. The State's burden of proving an enhancement allegation is satisfied when a defendant pleads true.[5] Finally,

---

[3]Tex. Code Crim. Proc. Ann. art. 26.13 (West Supp. 2015).

[4]*See State v. Guerrero*, 400 S.W.3d 576, 589 (Tex. Crim. App. 2013) (noting Texas Court of Criminal Appeals has repeatedly held article 26.13 statutory admonishments are not required in misdemeanor cases).

[5]*Harvey v. State*, 611 S.W.2d 108, 111 (Tex. Crim. App.) (op. on reh'g), *cert. denied*, 454 U.S. 840 (1981); *see Bryant v. State*, 187 S.W.3d 397, 401–02 (Tex. Crim. App. 2005) (holding stipulation to prior convictions relieves State of burden of otherwise proving that element).

9

Appellant pled not guilty. We therefore reject all his complaints premised upon a guilty plea. We overrule Appellant's second issue.

**Ineffective Assistance of Counsel**

In his remaining two issues, Appellant complains of ineffective assistance of counsel. Broadly mentioning "the black letter language of the Sixth Amendment" and "current case law," Appellant argues that we must review at least his third issue in the light most favorable to him. We reject this contention as inadequately briefed.[6]

### Standard of Review

To establish ineffective assistance of counsel, an appellant must show by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense.[7] An ineffective-assistance claim must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim.[8]

Direct appeal is usually an inadequate vehicle for raising an ineffective-

---

[6]*See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (citing cases), *cert. denied*, 132 S. Ct. 2712 (2012).

[7]*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999).

[8]*Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

assistance-of-counsel claim because the record is generally undeveloped.[9]  In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case.[10]  The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.[11]  Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient.[12]

It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record or when counsel's reasons for failing to do something do not appear in the record.[13]  Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."[14]  If trial counsel is not given that opportunity, we should not conclude that counsel's performance was deficient unless the

---

[9]*Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson*, 9 S.W.3d at 813–14.

[10]*Thompson*, 9 S.W.3d at 813.

[11]*See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307.

[12]*Nava*, 415 S.W.3d at 307–08.

[13]*Menefield*, 363 S.W.3d at 593; *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

[14]*Menefield*, 363 S.W.3d at 593.

11

challenged conduct was "so outrageous that no competent attorney would have engaged in it."[15]

The prejudice prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, that is, a trial with a reliable result.[16] In other words, an appellant must show a reasonable probability that, without the deficient performance, the result of the proceeding would have been different.[17] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[18] The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged.[19]

In his first issue, Appellant contends that former defense counsel told him that if he elected to have the trial court assess his punishment, he was guaranteed to receive at least thirty days' confinement in jail, that the trial court would not consider any arguments for fewer days in jail as a condition of community supervision, and that only by agreeing to the State's plea deal could Appellant avoid lengthy jail time. Appellant also complains that former defense

---

[15]*Nava*, 415 S.W.3d at 308.

[16]*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

[17]*Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

[18]*Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

[19]*Strickland*, 466 U.S. at 697, 104 S. Ct. at 2070.

12

counsel either did not investigate the legality of Appellant's prior DWI conviction or did not explain it well enough to him and did not give him a copy of the State's evidence to review. Appellant further complains that former defense counsel did not advise him as to his immigration status. But former defense counsel was not a witness in the hearing on the motion for new trial. Further, no evidence in the record indicates that the advice to take the deal was bad advice, that former defense counsel did not investigate Appellant's prior DWI conviction, or that former defense counsel did not discuss immigration consequences, if any, with Appellant, who, as the only statement in the record on the subject indicates, is not an immigrant subject to deportation. The Texas Court of Criminal Appeals has explained that "[u]nder normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional."[20] That is the situation here, especially since former defense counsel did not testify at the hearing on the motion for new trial or submit an affidavit. We therefore overrule Appellant's first issue.

In his third issue, Appellant complains of other aspects of former defense counsel's performance. Appellant contends that former defense counsel repeatedly mentioned Appellant's broken foot and use of prescription anxiety

---

[20]*Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

13

medications and that this strategy seemed to be the sole mitigating evidence to combat the State's evidence of .077 BAC. Appellant complains that former defense counsel never used the medical records to cross-examine the State's witnesses or to refute the State's toxicological theories and that former defense counsel mostly said nothing while the State's witnesses testified unimpeded by objections. Appellant also complains that former defense counsel failed to call an expert or to present any qualified expert witness medical testimony to support Appellant's only viable defense. Appellant additionally complains that former defense counsel would not allow him to testify in his own defense.

Our review of the record shows that former defense counsel vigorously cross-examined the State's witnesses and that his theory of the case seemed to be that (1) the stop, while supported by traffic violations, was supported by traffic violations that drivers commonly commit regardless of sobriety; (2) the negative results of any field sobriety test could be attributed to Appellant's medical conditions; and (3) Appellant was not intoxicated under either definition of intoxication. While former defense counsel did not call an expert, to prove ineffective assistance, Appellant would have to show that an expert was available to testify and that the expert's testimony would help Appellant's case.[21] Appellant has done neither. Finally, even if the trial court believed Appellant's testimony at the hearing on his motion for new trial that former defense counsel prevented him

---

[21]*See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *see also Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

from testifying, Appellant has not shown a reasonable probability that the outcome of the trial would have been different if he had testified.[22] Accordingly, Appellant has not met his burden to prove ineffective assistance.[23] We overrule his third issue.

**Conclusion**

Having overruled Appellant's three issues, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 30, 2016

---

[22] *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

[23] See *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

15